UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff-Counterdefendant,<br><br>v.<br><br>LEROY HOWELL, *et al.*,<br><br>Defendants-Counterclaimants. | Case No. 3:16-cv-00164-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

This lawsuit began as a boundary dispute between neighboring landowners. The parties settled in 2019, and as part of the settlement agreement, Defendant Leroy Howell agreed to clean up his property as well as some portions of the adjoining, government-owned property. The United States and the Nez Perce Tribe say that although Mr. Howell has cleaned up most of the property, he has breached the settlement agreement by refusing to remove several large chunks of concrete situated along Sevenmile Creek. Mr. Howell, on the other hand, says he is not obligated to remove the concrete because it is not sitting there in a useless pile, as the government contends. Rather, he says the concrete forms a type of riprap, as it was placed in and along the creek to protect against "stream action and erosion." The parties' efforts to informally resolve the dispute failed, and the United States

and the Tribe ask the Court to enforce the settlement agreement by ordering Mr. Howell to either remove the concrete or pay for the cost of doing so. For the reasons explained below, the Court will deny the request to summarily decide this dispute and will instead set an evidentiary hearing.

## BACKGROUND

A.  **The Boundary Dispute and The Lawsuits**

Defendant Leroy Howell owns approximately 128 acres of property near Kamiah, Idaho.[1] For several years, he operated a salvage yard on the northern part of the property and a sand-and-gravel-excavation and rock-crushing business on the southern part. The United States owns three tracts of land relevant to this dispute, and each tract borders the Howell property as depicted in the maps attached to the Settlement Agreement. *See, e.g., Settlement Agmt. Exs. 1, 8,* Dkt. 97-1. The United States has owned one of the tracts—a 41.07-acre tract referred to by the parties as "Allotment 1156"— since 1895, and it holds this land in trust for the benefit for certain enrolled members of the Nez Perce and Muskogee (Creek) Nation Indian Tribes. The other tract of government-owned land relevant to this dispute—which the parties refer to as "Tract 3193A"— consists of two separate,

---

[1] Mr. Howell entered into the 2019 settlement agreement personally and in his capacity as personal representative of the Estate of Katherine Howell. Mrs. Howell died during the pendency of this litigation.

MEMORANDUM DECISION AND ORDER - 2

43.69-acre tracts. The United States acquired Tract 3193A in 2007 when the Bureau of Land Management (BLM) transferred the tracts to the Bureau of Indian Affairs.

In 2005, the BLM completed a "dependent resurvey" of land in the area. According to the resurvey, the Howells' salvage yard was encroaching on Allotment 1156 and their other business was encroaching on Tract 3193A. The Howells disagreed with the resurvey and brought a quiet title action. *Howell v. Nez Perce Tribe,* No. 3:11-cv-00653-EJL (D. Idaho 2011). The Court dismissed the action on sovereign immunity grounds, however, and the Howells appealed. In 2016, while that appeal was pending, the United States sued the Howells (in this action, No. 16-cv-284) for trespass, ejectment, nuisance, and conversion. As noted above, the parties reached a global settlement in 2019. *See 2019 Settlement Agmt.* Dkt. 97-1

**B.     The Settlement Agreement**

In broad strokes, the parties agreed to the following: (1) they would accept the results of the BLM resurveys; (2) the Howells would clean up and remediate their property as well as some portions of the adjacent property held by the government; (3) portions of the properties were divided into six "Decision Units," with the cleanup of each Decision Unit proceeding according to an 18-month schedule; and (4) after the cleanup and remediation were completed, the Howells

would convey their property to the Nez Perce Tribe for an agreed-upon price.

The parties agree that Mr. Howell satisfactorily completed the majority of the cleanup and remediation. Indeed, as Mr. Howell points out, he did so "[t]hrough the difficulties of COVID, a heart attack, a stroke, and the death of his wife . . . ." *Opp.,* Dkt. 110, at 2). The only remaining issue is whether he is obligated to remove those concrete chunks situated along Sevenmile Creek. Mr. Howell explains that he placed the concrete—which he refers to as River Blocks—"along and in the riverbed of Sevenmile Creek . . . as a barrier to protect against stream action and erosion especially during the spring run-off season of the year, where significant damage to surrounding land mass has occurred and which was stopped by the placement of said River Blocks." *Howell Dec.*, Dkt. 111, ¶ 5. He says that when the parties evaluated the settlement agreement, the concrete had been in place for more than 40 years. *Id.* ¶ 7. The concrete pieces came from an old bridge, which the State of Idaho demolished and hired Howell to haul off. *See Howell Dep., Ex. 1 to Gollis Dec.*, Dkt. 103-1, at depo. tr. pp. 83:11 to 84:19. There are several pictures of the concrete in the record, four of which are shown here:



*See Ex. A to Forseth Dec., Photos 9, 15, 21, 24,* Dkt. 104-1.

Mr. Howell's cleanup and remediation obligations are laid out in paragraph 2 of the Settlement Agreement, which provides as follows:

2. **Cleanup and Remediation of Allotment 1156, Tract T3193A, and the Howell Property.** Mr. and Mrs. Howell shall complete the cleanup and remediation of the Howell Property, Allotment 1156, and Tract T3193A pursuant to the terms of paragraph 2 of this Agreement. *The cleanup shall consist of the offsite removal of all equipment, scrap, and other materials from the surface of the Howell Property, Allotment 1156, and Tract T3193A, including . . . the removal of the shop building located on the Howell Property and Allotment 1156 in Decision Unit 6, the removal of the area of asphalt located on the Howell*

MEMORANDUM DECISION AND ORDER - 5

> *Property in Decision Unit 5, and the removal of the residence located on the Howell Property in Decision Unit 4.*

Dkt. 97-1, ¶ 2 (emphasis added; footnotes omitted).

## C.     The Dispute Regarding Mr. Howell's Cleanup Obligations

The government says the italicized language plainly and unambiguously obligates Mr. Howell to remove the concrete. It therefore asks the Court to order specific performance. Alternatively, the government asks the Court to order Mr. Howell to pay the cost of removing the concrete chunks, which it estimates at $50,000. Mr. Howell, on the other hand, says the italicized language is ambiguous and that an evidentiary hearing is necessary to determine the parties' intent. He says that when such evidence is considered, it will become apparent that the parties never agreed that he would be required to remove the concrete. Mr. Howell estimates the removal cost to be in the range of $50,000 to $150,000. He says if he knew he would be required to remove the concrete, he would have taken that into account when negotiating the agreement. *See Opp.,* Dkt. 110, at 3.

## LEGAL STANDARD

As a general matter, courts retain jurisdiction to enforce the terms of a settlement agreement. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994). "However, the district court may enforce only complete settlement agreements. Where material facts concerning the existence or terms of an agreement to settle are in dispute, the parties must be allowed an evidentiary

hearing." *Callie v. Near*, 829 F.2d 888, 891 (9th Cir. 1987). Here, the parties do not contest the formation or validity of the Settlement Agreement. They do, however, dispute the scope of Mr. Howell's cleanup obligations, which are described in paragraph 2 of the Settlement Agreement.

Under these circumstances, the summary-judgment standard governs, as plaintiff is asking the Court to summarily resolve this matter, based on its assertion that there are no genuine disputes as to the material facts and that it is entitled to judgment as a matter of law. *See Mtn. Mem.*, Dkt. 13 at 9. Under that familiar standard, plaintiff bears the initial burden of demonstrating the absence of a genuine dispute as to a material fact and that it is entitled to judgment as a matter of law. *See generally* Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## ANALYSIS

The analytical starting point for resolving this motion is found in paragraph 2 of the Settlement Agreement, which was block quoted above. A pared-down version of the key sentence in that paragraph is shown again here:

> The cleanup shall consist of the offsite removal of all equipment, scrap, and other materials from the surface of the . . . [properties], including, . . . the removal of the shop building . . . , the removal of the area of asphalt . . . , and the removal of the residence . . . .

Dkt. 97-1, ¶ 2. Although the parties frame the issues a little differently, the Court

MEMORANDUM DECISION AND ORDER - 7

identifies three questions presented by the motion: (1) Is the term "scrap" ambiguous? (2) Is the concrete at issue nothing more than a pile of "scrap," or is it something else altogether now, given Mr. Howell's efforts to use the concrete as riprap? (3) Are the terms "other materials" and "including" ambiguous? For the reasons explained below, the Court concludes that although the term "scrap" is unambiguous, there is a factual dispute as to whether the concrete is "scrap." As for the third question, the Court finds the terms "other materials" and "including," as used in this contract, to be patently ambiguous.

### A.     Contract Interpretation Basics

The Court will analyze each issue in turn, though it will first review basic rules of contract interpretation. Contracts are interpreted and enforced according to the laws of the jurisdiction where they were formed or where performance occurs. *O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004), citing *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992). Contract interpretation requires an initial determination as to whether the language is ambiguous. *ABK, Ltd. Liab. Co. v. Mid-Century Ins. Co.,* 454 P.3d 1175, 1183 (Idaho 2019). Idaho courts have consistently held that contract ambiguity "is a question of law over which [they] exercise free review." *Swanson v. Beco Constr. Co.*, 175 P.3d 748, 751 (Idaho 2007) (citation omitted). Ambiguous contract terms are those which present more than one reasonable interpretation. *Id.*

**MEMORANDUM DECISION AND ORDER - 8**

When determining if contract language is ambiguous, courts consider two possible types of ambiguity—patent and latent. The Idaho Supreme Court has explained the difference between these two types of ambiguity as follows:

> A patent ambiguity is an ambiguity clear from the face of the instrument in question. On the other hand, a latent ambiguity exists where an instrument is clear on its face, but loses that clarity when applied to the facts as they exist. If the Court finds an ambiguity, the interpretation of the contract term is a question for the fact-finder. If the Court finds no ambiguity, the document must be construed in its plain, ordinary and proper sense, according to the meaning derived from the plain wording of the instrument.

*Thurston Enterprises, Inc. v. Safeguard Bus. Sys., Inc.*, 435 P.3d 489, 498 (Idaho 2019) (internal citations, quotations, and alterations omitted). The process for determining whether there is a patent ambiguity is simple enough: The Court looks within the four corners of the agreement. The process for divining a latent ambiguity is divided into two parts: "First, the introduction of extrinsic evidence to show that the latent ambiguity actually existed; and, second, the introduction of extrinsic evidence to explain what was intended by the ambiguous statement." *Greenbriar Estates Homeowners' Ass'n, Inc. v. Esposito*, 526 P.3d 1032, 1040 (Idaho 2023).

**B.   Scrap**

The Court will begin with the easier question, which is whether the word "scrap" is ambiguous. The government says the word "scrap" is unambiguous and, further, that the concrete chunks are, without question, scrap. This, in turn, would

MEMORANDUM DECISION AND ORDER - 9

mean Howell is obligated to remove the concrete, given his contractual agreement to remove all "equipment, *scrap*, and other material, . . . ." *Settlement Agmt,* Dkt. 97-1, ¶ 2. Howell, for his part, acknowledges that "the remaining concrete in Decision Unit 5 . . . could *potentially* be considered a type of scrap material . . . ." *Opp.*, Dkt. 110, at 16 (emphasis added). But he says that given the facts here, the concrete cannot be characterized as scrap. He says this is so because when he brought the concrete onto his property, he had no intention of reselling or recycling it. *Id.* According to Howell's argument, then, determining whether any given item on his property is "scrap" would require ascertaining why he bought the item onto his property in the first place, and what he intended to do with it at the time. He points out that during his deposition, when asked why the concrete was on his property and what he planned to do with it, he "responded that the State had paid him to haul it away from and old bridge, and he did not plan to do anything with it or move it from its current location." *Id.* Thus, he concludes that the concrete chunks cannot be scrap.

  The Court is not persuaded by this approach to deciding whether something is scrap. And, more broadly, the Court does not find any ambiguity in the word "scrap." Scrap is a commonly used word, and any reasonable speaker of the English language would agree that the remnants of the demolished concrete bridge, regardless of how large, were fairly categorized as scrap some 40 years ago, when

the State hired Howell to haul the remnants of the bridge away. At least one other court has considered the word "scrap" (in that case as a verb, rather than as a noun) and concluded that the terms "scrap" and "scrapped" have plain, ordinary meanings, lacking in ambiguity. *See Young Dental Mfg. Co. v. Engineered Products, Inc.*, 838 S.W.2d 154, 156 (Mo. Ct. App. 1992). In that case, the court called upon the dictionary definition of the terms, as well as some common-sense advice from Professor Corbin:

> Simply put, to paraphrase Professor Corbin, we should take people as they are and language as it is. Admittedly, a dictionary does not and cannot give all the possible meanings of a word. It can, however, give the meaning which is the ordinary meaning when used in common parlance. And when that meaning is common enough, a court should not indulge in the vagaries of the legal mind to seek an uncommon meaning.
>
> The meaning of "scrap" or "scrapped" has such an ordinary, everyday meaning. "Scrapped" is defined as "to make into scrap: dispose of as scrap often for salvage; to abandon or get rid of as no longer of enough worth or merit, use, or effectiveness to retain." *Webster's Third New International Dictionary* 2039 (unabridged) (1967). "Scrap" is also defined as "being in the form of scraps or fragments: valuable only as raw material." *Id*. The synonym offered by Webster's dictionary for "scrap" is "discard". *Id*. Thus, to discard, to dispose of, or to abandon is the plain, common sense, ordinary meaning of the term "to scrap" and "scrapped" follows this meaning.

*Id.* Although the noun form of the word "scrap" is at issue here, the Court is nonetheless persuaded by this logic. In short, the common, ordinary meaning of the word scrap doesn't necessarily mean the item in question must be destined for

MEMORANDUM DECISION AND ORDER - 11

recycling or resale before it can be characterized as scrap. Rather, "scrap" is capacious enough to include items or parts that are simply "broken, discarded, or rejected . . . ." *See dictionary.com* (definition of "scrap") (last visited Sept. 4, 2024). Also, "scrap" is defined as a fragment of a larger item. *Id.* And so it is here: When the State of Idaho demolished an old concrete bridge, they hired Howell to haul away the scrap. Accordingly, the Court concludes that the concrete remnants of the bridge were "scrap" when Mr. Howell hauled them onto his property.

The more interesting question is whether the concrete scraps from the demolished bridge have been transformed into something different by virtue of having been placed in and along the streambed "to protect against stream action and erosion . . . ." *Howell Dec.*, Dkt. 111, ¶ 5; *see also id.* ¶ 6 (Howell explains that he chose the placement of the "River Blocks" in an effort to "protect and solidify the creek bank"). Consider a hypothetical: someone uses a pile of scrap lumber to build a shed. An ordinary person would no longer refer to the shed as "scrap." On the other hand, if the pile of scrap lumber is simply arranged as an impromptu lean-to to shelter from the weather, it might still be regarded as "scrap"—creatively arranged, but still "scrap." By analogy, the question here is whether, by placing the concrete in an along the creek bed, Howell creatively arranged the concrete to give it some utility or, alternatively, did he transform the scrap into something else entirely—something that is no longer fairly characterized as a pile of scrap. *See*

MEMORANDUM DECISION AND ORDER - 12

generally *Foster v. United States,* 2 Cl. Ct. 425, 439 (Ct. Cl. 1983) (observing, albeit in a different context, that in an area where there was a shortage of high quality rock suitable for riprap, "[b]roken concrete on occasion has been used as a substitute for hard rock riprap").

The government suggests that the concrete chunks cannot be categorized as riprap because its experts have said the concrete does not provide any flood-control benefits. *See Mtn. Memo.*, Dkt. 102-1, at 7, 14-16. Mr. Howell, however, has stated he was able to prevent "significant damages to the surrounding land mass" by his placement of the concrete. *See Howell Dec.*, Dkt. 111, ¶ 5. This factual dispute will need to be resolved in the context of an evidentiary hearing. Further, while overall effectiveness of the riprap might well be considered when determining if the scrap is truly riprap, it may not be dispositive. After all, returning to the shed hypothetical above, if the shed wasn't well built—say it leaked or was unstable— that wouldn't necessarily mean the structure would revert to being characterized as a pile of scrap. Finally, although the government points out that the riprap isn't watertight, there is no evidence that riprap must be watertight to count as riprap. Indeed, while riprap isn't often the subject of litigation, at least one court has observed in passing that the riprap at issue there didn't serve a flood-control purpose. *See Nussbaum v. Dep't of Energy & Env't Prot.,* 261 A.3d 1182, 1186–87 (Conn. Ct. App. 2021) (noting that nearly all the rocks comprising the riprap at

issue were submerged at high tide). Granted, that court wasn't passing on whether the structure was a pile of scrap or riprap, but it at least suggests that riprap doesn't have to be watertight to function as riprap. In short, the Court finds that an evidentiary hearing is necessary to determine whether the concrete may be fairly characterized as a pile of scrap.

C.   **"Other Materials" and "Including"**

An evidentiary hearing is likewise necessary to determine the meaning of the contractual phrases "other materials" and "including." These phrases appear in what is a perplexing, contradictory sentence. That sentence, which was quoted above, begins by obligating Mr. Howell to remove "all equipment, scrap, and other materials" from the surface of the properties. So far, so good. But then the sentence takes an odd turn. The next clause of the sentence, set off by a comma, begins with "including"— as in Mr. Howell is obligated to remove all equipment, scrap, and other materials from the surface of the property, *including* . . . . Given that structure, the reader logically expects the specified items following the word "including" to be pieces of equipment, scrap, or some other, similar material. But that's not what happens. Instead, the items called out are a residence, a shop building, and a patch of asphalt. Nobody would refer to those items as "equipment, scrap, or other materials." And, as Professor Corbin has reminded us, we should take people as they are and language as it is.

**MEMORANDUM DECISION AND ORDER - 14**

The Court finds that there are two plausible interpretations of this contradictory sentence. The most logical, common-sense interpretation is accomplished by replacing the word "including" with the word "and" or "plus," such that the Howells are obligated to remove all equipment, scrap, and other materials, *and* the three specified items. This construction respects the fact that the three specifically listed items are not, by any stretch, "equipment, scrap, or other materials." And although the words "include" or "including" typically signal a non-exhaustive list, this is not always so. *See, e.g., Premier Health Care Investments, LLC v. UHS of Anchor, L.P.*, 849 S.E.2d 441, 448 (Ga. 2020) (concluding that the statutory term "include" was "used in a limiting sense, introducing an exhaustive list . . . ."). When the contract is viewed in that light, Mr. Howell's interpretation of it is certainly plausible. As he puts it, "Where the parties intended to require removal of items not like equipment and salvage partes, such as buildings, concrete floors and asphalt, such items were specifically called out for removal." *Opp.*, Dkt. 110, at 3.

But a second, broader reading is also plausible. Under this reading, the Howells are indeed obligated to remove everything from the surface of the properties except: (1) the stockpiled materials (gravel, etc.) referenced in a later provision; and (2) any other natural materials, such as vegetation, stones, trees, and the like. According to the government, this is how the contract should be

**MEMORANDUM DECISION AND ORDER - 15**

interpreted. The government relies on the overall sentence structure—particularly including the use of the word "including"—to argue that "materials" has a far more expansive meaning than the common, everyday meaning of the word. As the government puts it, "[b]y '*including*' the shop building, asphalt pad, and residence as examples of 'other materials,' the Agreement gives 'other materials' an expansive, but non-exhaustive, reach to include any items located in the surface of the Subject Properties." *Mtn. Mem.,* Dkt. 102-1, at 17. This interpretation of the contract is at least plausible.

At the end of the day, then, the contract is ambiguous because it is reasonably susceptible to more than one interpretation. *See Swanson v. Beco Constr. Co.*, 175 P.3d 748, 751 (Idaho 2007). The Court reviewed the entire contract to see if the other provisions might shed some light on how to interpret the disputed provision. For the most part, the Court came up empty. The term "materials" is used throughout the contract, but not consistently. Sometimes the term was defined; sometimes it wasn't. *See, e.g., Settlement Agmt.,* Dkt. 97-1, ¶ 2.B (using the term "material" without defining it in the phrase "replacement soils and other fill material"); ¶ 5.J (defining "stockpiled material" to mean "rock, gravel, and other resource material stored on the Howell Property" and as depicted in Exhibit 9 to the agreement); *Ex. 9* (defining "Material" to mean certain "sand, rock, and gravel . . . sourced from nearby Lawyer Creek . . . ."). The upshot is that

MEMORANDUM DECISION AND ORDER - 16

while the remainder of contract does clarify that the Howells were forbidden from removing "sand, rock, gravel, trees, or other natural resources" from the properties, the use of the word "materials" elsewhere in the contract doesn't resolve how the Court should define the phrase within the paragraph 2. In lobbying for the broadest possible reading, the government says, "The broad purpose of the cleanup-and-remediation provisions was to restore the Subject Properties as close as possible to their condition prior to Mr. Howell's activities." *Reply,* Dkt. 112, at 5; *see also Mtn. Mem.*, Dkt. 102-1, at 14. But the contract doesn't say that, either in paragraph 2 or elsewhere. Rather, the recitals describe the history of the boundary dispute, and then the cleanup obligations are laid out in paragraph 2 of the agreement. Thus, notwithstanding this argument, the Court finds the phrase "other materials, including…." ambiguous. The Court will therefore deny the motion to summarily enforce the settlement agreement and will instead conduct an evidentiary hearing.

## ORDER

**IT IS ORDERED that** the United States and the Nez Perce Tribe's Joint Motion to Enforce Settlement Agreement (Dkt. 102) is **DENIED.** The Court will conduct an evidentiary hearing, which will be scheduled in a separate order.



DATED: September 4, 2024

_____
B. Lynn Winmill
U.S. District Court Judge